Metro Taxicabs, Inc., demandante y apelada, *v.* Tesorero de Puerto Rico, demandado y apelante.

Núm. 10295.—*Sometido:* Marzo 1, 1951. *Resuelto:* Febrero 26, 1952.

*Hon. Procurador General Víctor Gutiérrez Franqui (Vicente Géigel Polanco, ex Procurador General,* en el alegato) y *Manuel J. Medina Aymat, Procurador General Auxiliar,* abogados del apelante; *F. Fernández Cuyar* y *Luis Tirado Géigel,* abogados de la apelada.

EL JUEZ ASOCIADO SEÑOR NEGRÓN FERNÁNDEZ emitió la opinión del tribunal.

El día 13 de marzo de 1949, agentes de rentas internas sorprendieron el vehículo P–24141, marca Pontiac, propiedad de la Metro Taxicabs, Inc., mientras era utilizado para transportar bebidas alcohólicas sobre las cuales no se habían pagado los correspondientes derechos de rentas internas. El Tesorero de Puerto Rico procedió a confiscar dicho vehículo, a tenor con las disposiciones del artículo 62 de la Ley núm. 6 de 30 de junio de 1936 ((2) pág. 45) conocida como "Ley de Espíritus y Bebidas Alcohólicas", según quedó enmendado por la Ley núm. 244 de 12 de mayo de 1945 (pág. 817).(1)

La demandante apelada, dentro del término y en la forma dispuesta en el artículo 97 de la ley, recurrió al Tribunal de Distrito de San Juan solicitando que se ordenara la devolución y entrega del vehículo objeto de la confiscación. Celebrada la vista el 28 de abril de 1949 y sometido el caso, se reabrió más tarde para recibir prueba adicional de la demandante, lo que se hizo el 9 de noviembre. El tribunal in-

---

(1) Dicho artículo dispone:

"El Tesorero queda por la presente autorizado para confiscar cualquier vehículo, bote, lancha de motor, caballo o bestia, o cualquier embarcación marítima o aérea que se capture cargado, o en el momento de cargar o descargar o de estar transportando, llevando o trasladando espíritus destilados o bebidas alcohólicas fabricados, importados, destilados o rectificados ilegalmente y sobre los cuales no se hubieren pagado los impuestos prescritos por esta Ley; y los mismos serán vendidos en pública subasta para beneficio de El Pueblo de Puerto Rico; *Disponiéndose,* que el Tesorero, a su discreción, y si el servicio público así lo requiere, podrá designar aquellos vehículos, botes, lanchas de motor, caballos, que estimare necesarios para uso oficial de los funcionarios o empleados debidamente autorizados del Departamento de Hacienda."

ferior revocó la decisión del Tesorero y ordenó la devolución y entrega del vehículo a la Metro Taxicabs, Inc. Apeló el Tesorero para ante este Tribunal, y sostiene en su alegato que la corte inferior erró (1) al resolver que en este caso prácticamente lo que hubo fué un hurto de uso del vehículo, toda vez que la persona encargada del mismo en los momentos de la confiscación entró en su posesión por medio de engaño o artificio, sin conocimiento ni autorización de la demandante apelada; (2) al resolver implícitamente que la demandante apelada constituye un tercero inocente a favor de quien podía ejercitar su discreción, ordenando la devolución del vehículo, y (3) al revocar la decisión del Tesorero de Puerto Rico decretando la confiscación del vehículo.

■ Las conclusiones de hecho del tribunal inferior fueron las siguientes:

"La Metro Taxicabs, Inc. es una corporación doméstica, dueña y operadora de una empresa de taxímetros dedicados al transporte de pasajeros mediante paga. Dicha empresa es propietaria del vehículo aquí confiscado, el cual era parte integrante de su flota de taxímetros el día 13 de marzo de 1949. La noche anterior a dicha fecha la demandante asignó a Andrés Alicea Crespo el vehículo referido para trabajar un turno que terminaría a las seis de la mañana del día 13 de marzo. Alicea llevó a cabo su trabajo en el referido turno y a las cinco de la mañana regresó a la estación central de la demandante para dar cuenta de su labor y entregar el taxímetro. Entonces, habiendo encontrado a su amigo Ángel Gómez Gutiérrez en los alrededores de dicha estación central, Alicea tomó una vez más el vehículo con el objeto de transportar a Gómez hasta su hogar en La Perla, San Juan. En lugar de llevar a Gómez a La Perla, cuando ya iban por el Club Náutico, Alicea a sugerencia de Gómez se encaminó hacia un barrio de Bayamón para conseguir un 'viaje' que Gómez le informó tenía en dicha ciudad. Una vez en Bayamón, Gómez le pidió a Alicea que le entregara el vehículo, alegando que él (Gómez) conocía mejor el camino. Se detuvo el taxi frente a un cafetín, Alicea se desmontó y entró a dicho establecimiento a tomar café, y Ángel Gómez Gutiérrez entonces tomó el taxi y lo condujo, manejándolo a un barrio fuera de la ciudad de Bayamón. Allí obtuvo varias latas de ron y las in-

trodujo en el compartimiento posterior y en el asiento trasero del taxi y regresó a Bayamón. Recogió a Alicea en el cafetín donde este último había entrado, continuando entonces en dirección hacia San Juan por la carretera número dos. Al darse cuenta Alicea de que Gómez Gutiérrez había introducido ron en el vehículo, protestó de tal hecho pero debido a lo avanzado de la hora y al hecho de que Alicea tenía que regresar a San Juan donde vivía y hacer entrega del taxi a la demandante, montó en el vehículo. Cuando el taxímetro pasaba por frente al Hospital de Distrito de Bayamón sufrió la rotura de un neumático y mientras el mismo era reparado fué sorprendido por los agentes de Rentas Internas, Luis López Silva y José Cintrón Rivera quienes ocuparon el ron y el vehículo."

En sus Conclusiones de Derecho, luego de hacer referencia a la ley aplicable, se expresó así:

"Se ha dicho que la confiscación es un procedimiento 'In Rem'. Va contra el vehículo mismo y no contra sus dueños. Es una acción de procedimiento civil que por su naturaleza es criminal. En ella el uso que se da a la cosa determina el hecho de la confiscación sin tomarse en cuenta ni tener que investigar el grado de culpabilidad o inocencia del dueño. La responsabilidad estriba en la posesión al momento de la violación no importa que la persona culposa lo esté usando en violación a las instrucciones del dueño. Al poner el dueño al infractor en posesión del vehículo, corre el riesgo del uso a que el poseedor lo someta. Y si las disposiciones de la Ley fueron por él violadas, la confiscación procede. Véanse *E. J. Fitzwilliam Co.* v. *Commonwealth*, 154 N.E. 570; *Buchholz* v. *Commonwealth*, 102 S.E. 760; *Commonwealth* v. *Certain Motor Vehicle*, 159 N.E. 613, 61 A.L.R. 548; *State* v. *One Studebaker Automobile*, 210 N.W. 194; *Pennington* v. *Commonwealth*, 102 S.E. 758; *Crapp* v. *State*, 98 S.E. 174.

"Tal es la doctrina general prevaleciente. Pero la Ley es justicia, y es justicia lo que se busca ante los Tribunales; de ahí, que la doctrina no es absoluta. Pudiendo las Cortes ejercitar su discreción a favor de personas inocentes sin perder de vista el interés o derecho que sobre el vehículo tiene el gobierno. *United States* v. *1935 Ford Coupe, etc.*, 17 F.Supp. 331; *C. I. T. Corporation* v. *United States*, 89 F.2d 977. En aquellos casos en que se demuestra a satisfacción del juzgador que la posesión del vehículo ha sido obtenida por el infractor sin el consenti-

miento expreso o implícito del dueño o del tercero inocente, como sucede, por ejemplo, cuando el vehículo ha sido 'hurtado', los derechos del dueño o del tercero inocente son protegidos y salvaguardados. Si el dueño o tercero interesado no ha puesto, ni directa ni indirectamente, el vehículo en posesión del infractor, entonces los derechos del dueño o tercero interesado no están sujetos a confiscación. Véase *General Motors Acceptance* v. *Brañuela,* 61 D.P.R. 725, 729–732 y los casos allí citados.

"La evidencia no deja lugar a dudas respecto al hecho de que el infractor en este caso, o sea, Ángel Gómez Gutiérrez, no fué puesto ni directa ni indirectamente en posesión del vehículo por la demandante. Dicha evidencia revela claramente que Gómez Gutiérrez no tuvo el consentimiento, ni expreso ni implícito, de Metro Taxicabs, Inc., para manejar o conducir o usar el taxímetro. Por el contrario, la prueba es clara y terminante en el sentido de que la demandante tenía estrictamente prohibidos a todos sus chóferes entregar los taxis a cualquier otra persona, ni aún a otros chóferes de la empresa, y también revela que estaba prohibido sacar los vehículos de la zona metropolitana sin permiso especial de la demandante, permiso que no se obtuvo en este caso. Como cuestión de hecho, por tanto, el uso o la posesión del taxímetro por parte de Ángel Gómez fueron ilegales y no autorizados. Prácticamente lo que hubo en este caso fué hurto de uso del taxímetro. Gómez entró en posesión del vehículo confiscado por medio de engaño o artificio sin conocimiento ni autorización de la demandante y en violación de las reglas de dicha empresa. *United States* v. *One Chevrolet Automobile,* 21 F.2d 477, aff. *United States* v. *General Motors Acceptance Corporation,* 25 F.2d 238. *United States* v. *One Reo Speed Wagon,* 5 F.2d 372, aff. *United States* v. *Almeida,* 9 F.2d 15.

"Es de tenerse en cuenta la circunstancia de que no se trata aquí de un vehículo privado sino de un taxímetro, parte de una flota de vehículos dedicados al servicio público."

Dada la naturaleza de los errores señalados por el apelante y el estado de nuestra jurisprudencia, debemos determinar, en primer lugar, si las conclusiones del tribunal inferior de que Gómez "no fué puesto ni directa ni indirectamente en posesión del vehículo por la demandante", y de que "Prácticamente lo que hubo en este caso fué hurto de uso del taxímetro", encuentran apoyo en la prueba. Sobre estos

extremos, Andrés Alicea Crespo, testigo de la propia demandante—y que fué la única prueba que tuvo ante sí el tribunal inferior en cuanto a la forma en que el vehículo pasó de la posesión de Alicea a la de Gómez—declaró en la vista sobre ampliación de prueba del 9 de noviembre de 1949 que como chófer suplente de la Metro Taxicabs, Inc. tenía el turno de 6 de la tarde del día 12 de marzo de 1949 a 6 de la mañana del día 13. Como a las cinco de la mañana "cuando yo venía a entregar me encontré a Ángel Gómez Gutiérrez, frente a la oficina de la Compañía" (en la Avenida Fernández Juncos 601 frente a la entrada del aeropuerto), quien lo estaba esperando para que lo llevara a su casa.([2]) No llegó a entregar y salió a llevarlo a su casa a "La Perla", en San Juan. Al llegar al Club Náutico, Gómez le dijo que doblara para la Avenida Ponce de León "porque tenía que ir a buscar un viaje a Bayamón".([3]) Alicea siguió con Gómez para Bayamón y "al llegar al cruce de Bayamón, que sigue para allá arriba que le dicen Mimiya", le dijo Gómez: "Como tú no conoces estos caminos que están un poco malos, si tú quieres dame el carro y yo voy a coger el viaje." Alicea "no sabía de qué se trataba y como él era chófer también [de la propia

---

([2]) El testigo de la apelada, René López de Victoria, telefonista de la empresa—encargado del servicio nocturno—declaró en la primera de las vistas que Alicea llegó a la oficina a las 5 de la mañana, recogió a Gómez y le dijo a él que iba a llevarlo a su casa y regresaría en seguida. A la hora que el testigo salió de su trabajo, seis de la mañana, Alicea no había regresado.

La testigo Blanca Barreras de Tirado, gerente-tesorera de la empresa, declaró en esa misma vista que "cuando hay algún empleado que rinde su labor a las dos de la mañana, o tres de la mañana, eso lo he autorizado yo expresamente al chófer que lo lleve a su casa de gratis."

([3]) Contestando la pregunta, en su interrogatorio directo en la vista del día 28 de abril, de si los taxis de la Metro Taxicabs, Inc. prestaban servicio "dentro y fuera del área metropolitana", la gerente-tesorera declaró que "En todo el área, en la isla entera"; que estaban autorizados para eso. Declaró asimismo que no constituía motivo de preocupación o de alarma por parte de los jefes de la Metro Taxicabs, y aun de los telefonistas mismos, el hecho de que transcurriera determinado período de tiempo sin que se supiera de un determinado chófer que tuviera asignado un vehículo que estuviera prestando servicio, y que un chófer podía tomar pasajeros sin notificación previa a la oficina central.

Metro Taxicabs, Inc.] yo le dí el carro y me quedé tomándome un café en lo que él venía." (⁴)    Al cabo de media hora regresó Gómez y traía "el contrabando" dentro del carro.    Alicea le dijo: "¿Qué es esto que te traes aquí?" respondiendo Gómez: "No es nada, móntate, móntate.   No va a pasar nada." Alicea se montó "porque tenía que ir a entregar el carro". Gómez manejaba.   Cerca del Hospital de Distrito se explotó una goma.   Alicea se disponía a arreglarla mientras Gómez "sacaba el ron para las cañas".   En eso llegaron los agentes de rentas internas y los sorprendieron.

A preguntas del Juez: "¿Usted protestó o no protestó?" contestó: "Sí".—"¿Y cómo siguió con él?   R. Porque ese carro yo lo tenía y tenía que entregarlo."

En la repregunta: No llegó a entrar a la oficina a liquidar su cuenta del taxi cuando cogió a Gómez para llevarlo a su casa.   No le iba a cobrar nada a Gómez.   No recibió instrucciones de nadie de llevarlo.   No sabía si al decirle Gómez "Dobla para Ponce de León, que tengo un viaje en Bayamón" se refería a un viaje de él (de Gómez) pero sería "algún

---

(⁴) Sobre este extremo, la gerente-tesorera declaró en repregunta, en la vista del 28 de abril, que Alicea, al llevarle la tarjeta correspondiente a las anotaciones del taxi uno o dos días después de los hechos, le dijo que no tenía "perdón de Dios", que lo único que le podía justificar era su debilidad.

"P. ¿Qué le dijo de su debilidad?

R. Porque él fué a llevar a Gómez a su casa a dormir, y que en vez de llevarlo lo llevó a casa de esta gente donde estaba el transporte, el contrabando, que él se negó, pero que estaba el dueño del contrabando allí, y que ésa fué su debilidad.

P. ¿Entonces iba Gómez, el dueño del contrabando y él?

R. Sí, en eso estima su debilidad.

P. ¿Eso se lo explicó él a usted?

R. Sí señor.

P. ¿En la primera oportunidad que tuvo de conversar con usted?

R. Sí señor.

P. ¿Tan pronto salió bajo fianza?

R. Sí señor."

Ya antes había declarado en su interrogatorio directo que Alicea le había dicho "doña Blanca, si tres años de presidio o cinco tengo que cumplir porque usted no pierda el carro diga la forma de hacerlo que yo lo hago." "Esto no tiene perdón, yo lo comprendo, pero yo he sido culpable."

cliente o algo y fuimos a cogerlo". Creyó que sería "alguna gente que tenía él para llevarla a algún lado".

Cuando Gómez le pidió el carro, él le dijo "Cógelo" y se lo entregó. Gómez se lo llevó y él se quedó tomando un "pocillo" de café. Al regresar traía el carro "lleno de ron" en su parte de atrás. Los agentes los sorprendieron mientras Gómez estaba sacando el ron del carro "para las cañas" (⁵) y él estaba "con el gato en la mano" para arreglar la goma.

En examen redirecto declaró que Gómez estaba trabajando de chófer suplente en la "Metro", igual que él, pero que esa noche no trabajaba; y que no había en la "Metro", que él supiera, ninguna regla o reglamento sobre entregarle el vehículo a otras personas. (⁶)

Ante estos hechos, fácil es advertir que la conclusión del tribunal inferior, en el sentido de que "Prácticamente lo que hubo en este caso fué hurto de uso del taxímetro"—luego de expresar que "Como cuestión de hecho, por tanto, el uso o la posesión del taxímetro por parte de Ángel Gómez fueron ilegales y no autorizados"—es errónea. El vehículo estaba en posesión de Alicea, empleado de la demandante, y Gómez

---

(⁵) Según declaró en la vista del 28 de abril el agente de rentas internas Luis López Silva, se ocuparon 17 latones conteniendo cada uno 5 galones de "ron caña" de fabricación clandestina; diez dentro del automóvil y siete dentro del cañaveral. Según este testigo—que declaró llamado por la apelada—y el otro agente de rentas internas José Antonio Rivera, además de Gómez, que sacaba el ron del automóvil, y Alicea, que estaba con "el gato" en la mano como para arreglar la goma, había una tercera persona en un cañaveral al lado de la carretera "cargando el ron para esconderlo en el cañaveral", quien al ver a los agentes salió corriendo por la pieza de caña. Según Rivera, al llegar los agentes Alicea dijo: "Me cogieron." La causa criminal que contra Alicea y Gómez se siguió en la Corte Municipal de Bayamón fué archivada en cuanto a Alicea a petición del abogado del Tesorero, que actuaba de Fiscal especial privado y quien informó que no tenía prueba contra dicho acusado. Gómez fué condenado después de un juicio.

(⁶) El Presidente de la corporación, Luis Tirado Géigel, declaró en la vista del 9 de noviembre que estaba prohibido que un chófer hiciera a otra persona, incluso a compañeros chóferes que estuvieren trabajando, entrega del vehículo asignado; que para salir de la zona metropolitána tenían que llamar a la Oficina solicitando autorización, lo que no se hizo en este caso.

vino en posesión del mismo por autorización de Alicea, quien se lo entregó a Gómez para que fuera "a buscar un viaje". Haciendo caso omiso ahora de la explicación que Alicea dió a la gerente-tesorera de la empresa en cuanto a lo ocurrido, véase nota 4, la declaración del propio Alicea revela que al regresar Gómez con "el contrabando" dentro del automóvil al sitio en que aquél se había quedado tomando café y le esperaba, Alicea subió al mismo "porque tenía que ir a entregar el carro", no obstante haber advertido que el automóvil venía "lleno de ron". Aunque a la pregunta del juez inferior de "¿Usted protestó o no protestó?" contestó "Sí", no dijo, sin embargo, en qué había consistido su protesta ni cómo la había manifestado. Por el contrario, su propio testimonio es revelador de su consentimiento—ya conocida la existencia del "contrabando" en el automóvil—a que Gómez continuara en la posesión y control del mismo de ahí en adelante, permitiendo que se le utilizara en la transportación de ron clandestino.

De acuerdo con la declaración de Alicea—que es en la que basa exclusivamente sus conclusiones de hecho el juez inferior—y sin entrar a considerar otros extremos que surgen del resto de la propia prueba de la demandante, es evidente que se trata en este caso, a lo sumo, del uso no autorizado de un vehículo por el empleado a quien le fué confiado, quien lo entregó a, y consintió y permitió que otra persona lo usara ilegalmente. Esa circunstancia, sin embargo, no protege a la demandante. En tal situación es de clara aplicación la regla expuesta en el caso de *General Motors Acceptance* v. *Brañuela*, 61 D.P.R. 725, en el sentido de que "si el dueño o tercero interesado directa o indirectamente ha puesto el vehículo en posesión del infractor o de la persona bajo la cual actúa éste, los derechos del dueño o tercero interesado en tales circunstancias corren la suerte del uso a que el poseedor pueda someter el vehículo". Así se expresó este Tribunal en dicho caso, interpretando el alcance del artículo 62 de la Ley de Espíritus y Bebidas Alcohólicas, supra:

"De otro lado, interpretando el artículo 3450 de los Estatutos Revisados de los Estados Unidos, de los cuales ha sido tomado el artículo 62 de la Ley de Bebidas, la Corte Suprema ha sostenido que el procedimiento de confiscación va dirigido contra el vehículo mismo y no contra sus dueños y que por consiguiente los derechos que sobre el vehículo puedan tener terceros inocentes no están protegidos, *excepto en aquellos casos en que se demuestre que la posesión del vehículo ha sido obtenida por el infractor sin el consentimiento expreso o implícito del dueño o del tercero inocente, como sucede cuando el vehículo ha sido hurtado.* En otras palabras, si el dueño o tercero interesado directa o indirectamente ha puesto el vehículo en posesión del infractor o de la persona bajo la cual actúa éste, los derechos del dueño o tercero interesado en tales circunstancias corren la suerte del uso a que el poseedor pueda someter el vehículo." (Bastardillas nuestras.)

La anterior doctrina está sostenida por los casos de *Goldsmith Jr.–Grant Co.* v. *United States*, 254 U. S. 505, 65 L. ed. 376 y *Dobbin's Distillery* v. *United States*, 96 U. S. 395, 24 L. ed. 637, citados en el de *Brañuela*, en cuanto a que los derechos que sobre el vehículo puedan tener terceros inocentes no .están protegidos por el artículo 3450 de los Estatutos Revisados de Estados Unidos—artículo 62 de nuestra ley, supra. En el de *Brañuela*, sin embargo, se exceptúan de esa regla los casos en que el vehículo ha sido *hurtado*, y aquéllos en que el infractor ha obtenido la posesión del vehículo sin el consentimiento expreso o implícito del dueño. Precisamente a esos fueron los casos que el Tribunal Supremo Nacional hizo mención en *Goldsmith Jr.–Grant Co.* v. *United States*, supra, reservándose su opinión en cuanto a si el artículo 3450 ya citado cubría "propiedad hurtada del dueño, o en alguna otra forma obtenida de él sin su conocimiento o consentimiento" (*property stolen from the owner, or otherwise taken from him without his privity or consent*).

Pero evidentemente ninguna de esas situaciones existe en el caso de autos. Aquí el vehículo no fué hurtado a la demandante, ni a su empleado—Alicea. Éste lo entregó a Gómez—aun cuando fuera en violación de reglas de dicha em-

presa—y Gómez con su conocimiento y consentimiento utilizó el vehículo en la transportación del ron clandestino. Los hechos sitúan claramente el caso dentro de la regla del de *Brañuela*, no siendo de aplicación, por tanto, los casos de *United States* v. *One Chevrolet Automobile*, supra, conf. en *United States* v. *General Motors Acceptance Corporation*, supra, y *United States* v. *One Reo Speed Wagon*, supra, conf. en *United States* v. *Almeida*, supra, citados por el tribunal inferior, y los últimos dos también por la apelada. Tampoco lo son los de *The Dependent*, 24 F.2d 538 y *United States* v. *One Ford Coupé Automobile*, 21 F.2d 639, citados por la apelada(7) en los cuales la situación es esencialmente similar al de *Sánchez* v. *Tesorero de P. R.*, 72 D.P.R. 133. El *ratio decidendi* en este último es al efecto de que no procede la confiscación de un automóvil público cuando un pasajero que aborda dicho vehículo introduce en el mismo un paquete que contiene ron clandestino, sin que el dueño—que lo guiaba—conociera o supiera del contenido del paquete.

En vista de lo anterior, forzoso es concluir que el tribunal inferior cometió error al revocar la decisión del Tesorero confiscando el vehículo y ordenar la devolución y entrega del mismo a la demandante. *Procede, por tanto, revocar la sentencia apelada y declarar sin lugar la demanda contra el Tesorero.*

---

(7) En cuanto al caso de *United States* v. *Two Barrels of Whisky*, 96 Fed. 479, también citado por la apelada, véase el de *United States* v. *One Saxon Automobile*, 257 Fed. 251.